## E. V. PRENTICE CO. v. ASSOCIATED PLYWOOD MILLS, Inc.

Civ. No. 6579.

United States District Court
D. Oregon.

April 17, 1953.

On Objections to Form of Proposed
Judgment May 8, 1953.

William H. Kinsey and J. Pierre Kolisch, both of Portland, Or., for plaintiff.

Ford E. Smith, Seattle, Wash., for defendant.

Allan Hart, Portland, Or., for defendant, on objections to form of proposed judgment.

SOLOMON, District Judge.

This matter is now before the court on plaintiff's application for an allowance of attorney fees pursuant to 35 U.S.C.A. § 70, which provides that "The court may in its discretion award reasonable attorney's fees to the prevailing party upon the entry of judgment on any patent case."

In the case of Park-In-Theatres v. Perkins, 9 Cir., 1951, 190 F.2d 137, at page 142, the court, in construing such section, stated:

"The exercise of discretion in favor of such an allowance should be bottomed upon a finding of unfairness or bad faith in the conduct of the losing party, or some other equitable consideration of similar force, which makes it grossly unjust that the winner of the particular law suit be left to bear the burden of his own counsel fees which prevailing litigents normally bear."

Both parties agree that such construction of the statute is proper and binding upon this court and that the section in the new patent code, 35 U.S.C.A. § 285, which provides: "The court in exceptional cases may award reasonable attorney fees to the prevailing party", neither enlarges nor diminishes plaintiff's rights.

The pleadings and the evidence adduced not only at the trial but also at the hearing on the motion for attorney fees show that, in 1936, B. Raimann GMBH of Frieberg, Germany, a manufacturer of wood working machinery, obtained a German patent on an automatic veneer patching machine. In 1941, Per F. Skoog applied to the United States Patent Office for two patents, one a means patent and the other a methods patent, for the patching of veneer sheets. On December 14, 1943, both of such patents were issued to Skoog's assignee, the Olympia Plywood Machinery Corporation, the predecessor of defendant, Associated Plywood Mills, Inc.

For the sake of convenience, the plaintiff, E. V. Prentice Company, will be hereafter referred to as "Prentice"; the defendant, Associated Plywood Mills, Inc., as "Associated"; B. Raimann GMBH as "Raimann"; the German patent obtained by Raimann as the "Raimann patent"; the automatic veneer patching machine produced by Raimann as the "Raimann machine" or the "accused machine"; and the method and means patents issued to Associated's predecessor on December 14, 1943, as the "Skoog patents."

Prentice is in the industrial equipment business and sells, among other items, the Raimann machines which are imported from Germany. Associated's primary business is that of manufacturing plywood at its plant in Eugene, Oregon. It also has manufactured for it the Skoog veneer patching machines which it makes available to the plywood industry by lease agreements.

In June 1950, a Raimann machine was exhibited at the Forest Products Show in Portland, Oregon. Prentice, while negotiating for a distributorship of the Raimann line for the Pacific Coast states, invited a number of its customers, including Associated, to see and examine the Raimann machine. Pursuant to such invitation John Gragg, Associated's superintendent, saw the Raimann machine in operation. Shortly thereafter, Prentice obtained the exclusive distributorship of the Raimann machine for the Pacific Coast. Between July 1950 and August 1952, Prentice sold and delivered 59 Raimann machines to plywood manufacturing concerns in its territory. Some of these machines were used to replace the leased Skoog machines. During the year 1951, Associated became aware that Raimann machines were being sold to plywood manufacturers in this area.

During the early part of 1952, at the request of Skoog, the patent lawyer for Skoog (who was also the patent lawyer for Associated) visited a plywood plant and saw a Raimann machine in operation. They then communicated with Associated with reference to possible infringement actions and, on March 11, 1952, they met with Associated's Board of Directors. At that meeting, Associated gave them the advertising material which it had received on the previous day from Prentice. It consisted of a picture and description of the Raimann machine and a list of 31 users of the machine on the Pacific Coast. On April 30, 1952, Associated's Board authorized its patent lawyer to commence legal proceedings, first to prevent the use of the infringing machines and, second, to obtain damages.

Associated's patent lawyer made an investigation to determine whether the Raimann machine infringed any of the claims of the Skoog patents. But he did not contact either Prentice or Raimann and neither company knew that an investigation was being made.

On July 25, Associated's lawyer sent letters, by registered mail, to 29 of Prentice's 31 United States customers, who were listed in the advertising material mailed to Associated as having purchased Raimann machines. The letter stated in part:

"It has come to our attention as well as to our client that you are using machinery and processes for patching veneer which infringes said patents. Our client demands that you immediately cease and desist your infringement of said patents. Furthermore, our client demands an accounting of your profits in this infringement and payment for the damages it has suffered because of your unlicensed use of said infringing machinery and processes. We will expect to hear from you in this respect within ten days of the date hereof. Otherwise please be assured that we are authorized to seek legal redress for all continued infringements and will do so promptly."

No such letter was sent either to Prentice or to Raimann and neither company, prior to that time, knew that Associated claimed that the Raimann machine infringed the Skoog patents. The receipt of such letters caused great consternation among Prentice's customers and effectively stopped sales of Raimann machines, as well as other equipment sold or distributed by Prentice.

On August 8, 1952, Prentice filed an action in this court against Associated in which it prayed not only for a declaration of invalidity of all claims of the Skoog patents but also for a finding of no infringement. It also requested a permanent injunction restraining Associated from suing or threatening to sue any Raimann machine customer of Prentice for patent infringement or from asserting or charging that said Raimann machines infringed the Skoog patents. Prentice also demanded costs and reasonable attorney fees.

On August 15, 1952, additional letters were mailed by Associated to all firms who had not answered its letter of July 25, requesting information as to whether they had ceased the alleged infringing use of the Raimann machine.

On August 18, in the U. S. District Court for the Western District of Washington, Northern Division, Associated filed an action for damages against the Buffelen Manufacturing Company, a customer of Prentice who had purchased two Raimann ma-

chines, alleging that these machines infringed the Skoog patents. When it filed this case, Associated's lawyers knew the late Judge Charles H. Leavy, the judge of that court, had just retired after a long illness and that it was highly improbable that a successor would be appointed until after the November 1952 election.

On August 28, Associated filed its answer to Prentice's complaint filed in this court and it also filed a cross-complaint in which it demanded damages for infringement and unfair competition in the sum of at least $50,000 actual damages and three times its actual damages because of the wanton and willful character of such infringement. Associated demanded a jury on all issues of fact raised by its answer and cross-complaint.

On September 12, 1952, Prentice filed its answer to Associated's cross-complaint. In it, Prentice alleged: (a) anticipation by prior art, (b) no invention, (c) public knowledge of the Raimann machine in the United States, and (d) prior publications of the Raimann machine in foreign publications. Prentice attached a list and description of the patents on which it relied to show anticipation and no invention and a list of foreign publications in which the accused Raimann machine was described, two of which were published in the year 1938.

On September 22, this case was assigned an October 20 pretrial date.

On September 29, 1952, Prentice filed an amendment to its answer in which it set up the further defense that the accused machine was "on sale" in the United States more than one year prior to the applications for the Skoog patents.

On the same day, Prentice filed its motion for a preliminary injunction to restrain Associated from taking any further steps in the prosecution of its action against Buffelen Manufacturing Company, until final adjudication of this action and to enjoin Associated from threatening to commence, or from commencing, any action against any of its other customers for alleged infringement of the Skoog patents until this case was decided.

In an affidavit filed by Associated in opposition to the motion for a preliminary injunction, it alleged that Prentice did not have a published Dun and Bradstreet rating and, on information and belief, alleged that Prentice was financially unable to respond in damages. Associated further alleged that it was losing approximately $500 per month by reason of the loss of royalties on machines sold by Prentice. In the alternative, Associated requested that, if the Prentice motion for preliminary injunction were granted, it should be done only upon the condition that Prentice post a $10,000 bond.

On October 10, when the deposition of Per F. Skoog was taken, he was shown publications, all printed during or prior to the year 1938, which contained pictures or drawings and descriptions of the accused Raimann machine and, in some instances, the manner in which the accused Raimann machine operated.

On October 13, the motion for a preliminary injunction came on for hearing. Associated's lawyer opposed the granting of the preliminary injunction and argued that Associated should be permitted to proceed against Buffelen and other firms using the Raimann machine. I mentioned Judge Leavy's retirement and subsequent death and the improbability of the Buffelen case being tried prior to the date upon which this case could be tried, particularly in view of the fact that I was willing to give him an early trial date.

Associated's lawyer objected to an early trial date. He claimed that he and the other members of his firm were busy preparing other cases for trial. Upon learning that none of the other cases had been set for trial and that he could devote all of his time to this case, if necessary, I granted the temporary injunction and I set the case for trial on November 5.

On October 16, Associated filed a motion to vacate the order granting the preliminary injunction on the ground that Judge Edward Murphy had been assigned to the United States District Court for the Western District of Washington, Northern Division, for a period of 90 days and that it could reasonably be anticipated that an

early trial date could be had on the case filed by Associated against the Buffelen Manufacturing Company. This motion, however, was never pressed by Associated and was subsequently denied.

On October 18, 1952, the deposition of H. K. Von Maltitz, a Chicago equipment dealer, was taken. Von Maltitz testified that he offered to sell Raimann machines to the plywood industry in various parts of the country, including the West Coast, during and prior to 1939. Copies of the witness' correspondence with the Raimann Company during the period from 1936 to 1939, together with catalogues, pictures and descriptions of the Raimann machine which he received during that period, were marked and displayed to Associated's chief trial counsel who cross examined the witness.

On October 27, the deposition of Henry C. Relf, the managing director of Pacific Forest Industries (hereinafter referred to as P. F. I.), was taken. Associated is a stockholder-member of the P. F. I., which is the export sales organization for a number of plywood manufacturers including Associated. It also brings to the attention of its members technical and other information of interest to the industry. Mr. Relf testified that, in December 1937 in Rotterdam, Holland, he met Mr. Raimann and that Mr. Raimann, at that time, explained generally the operation of the accused machine.

The files of the P. F. I., which were marked and offered, showed that there was considerable correspondence between Raimann and P. F. I. during the years 1938 and 1939 and that Raimann had sent to P. F. I. pictures, catalogues, and other advertising material which described the operation of the accused Raimann machine. Price lists and samples of the work performed by the machine were also in the P. F. I. file.

Although Mr. Relf testified that he knew of his own knowledge that some of the members of the P. F. I. were told about the Raimann machine, he was unaware of all of the firms so contacted because Axel Oxholm, the former director of P. F. I. who had made the contacts, died in 1949.

On November 5, the trial was postponed for a period of one week to enable the parties to devote more time to the preparation of the pretrial order. On November 10, the pretrial hearing was held and at such time all, or practically all, the exhibits which each party intended to use in the trial were exhibited to opposing counsel. Although the pretrial order raised a number of issues, after consultation with the parties, I ordered the issues of infringement, validity and damages for infringement be segregated from the other issues and that only those issues would be submitted to the jury. The trial commenced on November 18.

During the trial, the file wrappers of the Skoog patents were introduced in evidence. They showed that all of Skoog's original claims were rejected by the examiner in his first report on the basis of the Raimann patent. Thereafter, in the prosecution of the Skoog patents, the inventor represented that there were two significant differences between the Skoog invention and the Raimann patent:

First, he claimed that, in his invention, unlike the Raimann patent, there was constant clamping of the veneer sheet from the time that the defective portion was removed until the patch was inserted in the cut-out area.

Second, he claimed that in his invention, unlike the Raimann patent, the entire operation was completed at one station.

Both of such representations were incorrect.

Even though the claims that were allowed in the Skoog patents were much narrower than those originally requested, the probabilities are that even these narrow claims would not have been allowed unless the Patent Office believed that the inventor's representations concerning the differences between the Skoog invention and the Raimann patent were correct.

It was undisputed that there were differences between the Raimann patent and the accused Raimann machines. Mr. Becker, the inventor of the Raimann machine, came from Germany for the trial. He testified that no Raimann machine was ever con-

structed identically with the Raimann patent; that, during the course of the construction of the Raimann machine, it became apparent that minor changes were necessary and that these changes were made in 1935 on the first machine that was ever produced. Mr. Becker further testified that he did not apply for additional patents on such improvements for the reason that he believed that such changes were not patentable because they were merely changes that any good mechanic, skilled in the art, would have found necessary and would have made. He introduced evidence to show that the machine as produced in 1935 was identical to the accused machine and was likewise identical to the machines that were advertised and described in the printed publications beginning in 1936.

The trial was concluded on November 24, at which time the jury returned a general verdict in favor of Prentice. The following special verdict was also returned:

1. Does the Raimann patent either alone or in combination with the Anderson or Painchaud patents anticipate the Skoog patents?

$$\frac{\text{x}}{\text{Yes}} \quad \frac{}{\text{No.}}$$

2. Does the combination of elements and steps in the Skoog patents produce an unusual and surprising result?

$$\frac{}{\text{Yes}} \quad \frac{\text{x}}{\text{No.}}$$

3. Was there public knowledge of the accused machine in the United States before the Skoog inventions?

$$\frac{\text{x}}{\text{Yes}} \quad \frac{}{\text{No.}}$$

4. Was the accused machine disclosed in publications before the Skoog inventions?

$$\frac{\text{x}}{\text{Yes}} \quad \frac{}{\text{No.}}$$

5. Was the accused machine "on sale" in the United States before the Skoog inventions?

$$\frac{\text{x}}{\text{Yes}} \quad \frac{}{\text{No.}}$$

In other words, the jury found against Associated on each of the issues submitted in the interrogatories, any one of which would have been sufficient to render the Skoog patents invalid.

Considering the record as a whole, I find that:

1. For some time prior to July 25, 1952, Associated knew that both the Skoog means and method patents were narrow improvement patents of doubtful validity.

2. Associated was earning a substantial income from the leasing of Skoog machines, which income was being threatened by the sale of the Raimann machines by Prentice.

3. Associated was reluctant to have the validity of the Skoog patents determined in a truly adversary court proceeding.

4. Associated knew that if it sued Prentice for patent infringement, Prentice would probably defend such action because the sale of Raimann machines had become one of its major sources of income.

5. Associated knew that it was unlikely that any customer of Prentice who had purchased one or two Raimann machines would defend a patent infringement suit because of the great expense that such a defense would entail.

6. Associated believed that, if it threatened enough customers of Prentice with patent infringement actions, Prentice, even if financially able, would not defend such actions, particularly if such customers required indemnity agreements.

7. Associated, when it sent letters to 29 of Prentice's customers threatening patent infringement actions and demanding damages, knew that such letters would effectively stop future sales of the Raimann machine and would probably require Prentice to inform its customers that it could neither defend them against such actions nor assume liability for damages in the event such cases were decided in favor of Associated.

8. Associated believed that by such letters it could, with little expense to itself and without running the risk of having the validity of the Skoog patents determined in a court action:

a. Maintain its earnings from the leasing of Skoog machines.

b. Destroy its competition from the Raimann machines.

c. Obtain substantial royalties from the Raimann machines.

9. Associated was a member of Pacific Forest Industries for more than 15 years prior to 1951. Pacific Forest Industries, as well as a number of plywood manufacturing concerns on the Pacific Coast, knew that the accused Raimann machine was known in the United States and had been offered for sale in the United States long prior to the date upon which Skoog applied for his patents. Even if Associated was unaware of these facts, it could easily have obtained this information by communicating with Prentice or Raimann.

10. Even assuming that Associated did not have the knowledge and intent which I have attributed to it in paragraphs numbered 1 to 8, inclusive, the mailing of letters demanding damages and threatening patent infringement actions to 29 of Prentice's Raimann machine customers was a reckless act, particularly in view of the following facts:

a. The accused machines were produced by Raimann, the holder of the basic patent on an automatic veneer patching machine.

b. Associated's claim for infringement was based upon minor improvements to such type of machine.

c. The Skoog patents might be invalid for reasons not disclosed in the file wrappers of such patents.

d. Although Associated's investigation to determine validity extended over a period of 5 months, it was grossly inadequate.

e. Associated could have communicated with either Prentice or Raimann, or both of them, during such investigation and prior to the mailing of letters to Prentice's customers, without any financial loss, even if it developed that the Skoog patents were valid, and the Raimann machine infringed such patents.

f. Associated knew that Prentice would necessarily incur heavy financial losses by the mailing of such letters to Prentice's customers.

11. Even after Prentice filed this action, Associated still hoped that, by mailing additional letters and by filing infringement actions against customers of Prentice, it could accomplish its original purpose.

12. The disclosures made in the depositions of Von Maltitz and Relf and in the exhibits which were identified and displayed to Associated's attorneys at these and other depositions taken prior to the trial, should have made it abundantly clear that the Skoog patents were invalid for a number of reasons. However, in spite of these disclosures Associated continued to claim that the Skoog patents were valid and infringed by the Raimann machines. Prentice was therefore required to incur additional expense in the further preparation and in the trial of this case which took more than 5 full days before a jury.

■ I appreciate that the granting of a patent by the United States Patent Office carries with it the presumption that the patent is valid. However, in my opinion, in spite of such presumpton, the facts above set forth show that Associated was guilty of such unfairness and inequitable conduct that it would be grossly unjust for Prentice to bear the burden of its own attorney fees.

■ Prentice was represented by two attorneys, one an experienced patent lawyer with trial experience. $7,025 was requested for him. The other was an experienced office lawyer with little trial experience and no patent experience. $3,500 was requested for him. Both attorneys calculated their charges on the basis of $15 an hour for preparation and $175 a day for the trial. No charge was made for travel time and, although there were many court appearances, the hourly rate was applied except for the days actually spent in the trial.

In my opinion, however, there was some duplication of effort and, under all of the circumstances, I believe that a fee of $7,500 for both attorneys is the total amount that should properly be charged against Associated. Prentice may therefore have judgment against Associated for reasonable attorneys' fees in the sum of $7,500.

## On Objections to Form of Proposed Judgment.

This matter is before the court on the objections of Associated to the form of judgment proposed by Prentice. Specifically, Associated contends that paragraph numbered three of the proposed judgment, which reads, "That the United States Letters Patent numbers 2,336,703 and 2,336,-704 are invalid and no effect in law," is too broad and should be limited to claims 1, 2 and 3 of the method patent (2,336,703) and claims 2, 3, 4, 5 and 6 of the means patent (2,336,704). Associated also contends that paragraph numbered four should be similarly limited.

Prentice filed an action in which it prayed for a declaration of invalidity of all claims of both patents and for a judgment of non-infringement as to all of such claims. Associated, in its answer, denied the allegations of Prentice's complaint and in its counterclaim alleged that such patents were valid and infringed by the accused machine.

Shortly before the trial, Associated withdrew its allegation of infringement as to claim 4 of the means patent and claims 1, 7 and 8 of the method patent. Such withdrawn claims describe a clamping device designed to prevent edgewise or lateral expansion of the veneer sheet.

In spite of such withdrawal, Prentice did not abandon its contention that all claims in both patents were invalid. It is admitted that, if evidence were adduced at the trial concerning such claims, Associated could not, by unilateral action, prevent a finding of invalidity as to the claims which it withdrew.

No transcript of the testimony has been furnished me so that I might check the testimony of the witnesses who described and explained the Skoog patents. However, the Skoog patents were introduced in evidence and drawings of the clamping device described in such withdrawn claims were likewise offered and admitted in evidence. I also recall that some of the witnesses described this device.

In my instructions, the jury was requested to bring in a finding as to validity of the Skoog patents without reference to any particular claim. In describing the invention which Skoog claimed, I stated, "Third, that the Skoog patents provide means and methods for retaining the patch against buckling and edgewise expansion from the time it is cut until inserted in the veneer sheet," and, later, I instructed the jury, "With reference to the means and methods described in the Skoog patents which the inventor claims prevent edgewise expansion and buckling, you are to determine from all of the evidence whether or not such elements or methods introduced a new and useful element and whether such elements, if found desirable, would not have been added by a skilled woodworking mechanic or engineer using a similar machine which did not have such means."

While it is true that the withdrawn claims do not refer to buckling but only to edgewise or lateral expansion and the retained claims refer to both buckling and edgewise expansion, in my opinion there was evidence from which the jury could find, under the intructions given them, that the withdrawn claims were invalid.

The jury found a general verdict in favor of Prentice. Special Interrogatory 2, which reads as follows: "Does the combination of elements and steps in the Skoog patents produce an unusual and surprising result?" was answered in the negative.

Only in that portion of my instructions dealing with infringement, did I inform the jury that Associated did not claim that the accused Raimann machine infringed the withdrawn claims.

In the case of Kawneer Co. v. Pittsburgh Plate Glass Co., D.C.1952, 103 F.Supp. 671, 677, the owner of a patent filed an action against the defendant for infringement and, upon motion, limited its claim of infringement to claim No. 2. The defendant answered denying infringement, alleging invalidity of the patent and, by counterclaim, asked for a declaratory judgment determining that the patent and each claim thereof is invalid. Later, the plaintiff advised the court and the defendant that, at the trial, it would rely not only on claim 2 but also on claims 4 and 7.

At the trial, the plaintiff moved to strike defendant's counterclaims as to all claims of the patent except 2, 4 and 7 on the ground that, having specified only these three claims as infringed, there was no actual controversy as to the other claims. The court denied this motion and continued the case for determination on the merits as to the issues of validity and infringement of all claims of the patent.

One of the reasons the court gave for such action was "to avoid a multiplicity of suits, for the future protection of the parties, and in the public interest, the questions as to the validity of all claims of the patent and, if valid, as to the defendant's alleged infringement thereof should be determined in the present litigation".

In my view, these considerations are equally applicable here. In this case, the pleadings created "an actual controversy;" evidence as to validity of all claims was introduced; the jury was not limited to specific claims in the instructions on validity; and the jury found that the patents were invalid. Under such circumstances, Associated should not be permitted, at this late date, to restrict the finding of invalidity to only those claims which Associated contended were infringed.

Associated's objections to the judgment proposed by Prentice are overruled and the judgment in the form submitted will be entered today.